Good morning. May it please the court. My name is Jason Ehrenberg, and I represent the appellant Paula Pagonakis, and I would like to reserve five minutes for rebuttal. Okay. Mr. Ehrenberg, can you help me on this? We haven't discussed the case, and I'm speaking for myself, but in reading it, I get a feeling that the shield of the Americans with Disabilities Act, which is there to shield employees from disability-based discrimination, is being converted into a very sharp-tipped sword. It's being converted into a weapon to attack an employer, which it seems did the kind of thing that we, and certainly Congress, expected of employers when confronted with someone who could perhaps perform the duties of her job, given certain kinds of accommodations. What am I missing? It seems like they've been over backwards for us. Well, they've been over backwards for several years, and then they made a determination after they promoted her into a managerial position that they had no obligation to work with her at that point. Well, they continued to work with her based upon the prior accommodation, and then the way I read it, there came a point when they discovered that, I guess it was the store manager discovered that in order to give that kind of accommodation, they needed to have medical documentation. At that point, and that was in November, I guess, or December 23, they go to her and say, and we've been doing this all along. Well, back up, they continued doing it when she became co-manager based upon the fact they'd already been doing it. So they said, we've been doing this for you, we're going to continue doing it, and they thought they could do that. They then, and I don't think it's disputed, they then found out, I guess from HR, that in order to give that kind of accommodation, they had to have medical recommendation. They didn't go to her and say, look, we don't have anything in our files from you to support this, therefore you're no longer our manager. They went to her and said, we need something for our files. Well, actually, Your Honor, what they did, and I think this is, kind of gets to the point of what we tried to argue in our brief, is the evidence, the quote evidence they presented on summary judgment provides a different rationale for their action than the evidence, contemporaneous evidence. And the contemporaneous evidence shows that HR did make some decision. They found out that this person had been receiving accommodations, and they said, apparently it's not our policy to allow people accommodations unless we have medical documentation. In that position? In the managerial position? I don't know. All that was told to my client at the time, and all that the record reflects, is the fact that my client was told at a meeting with her district manager, or somebody of that ilk, that they had lost her personnel file. And because we lost her personnel file, we don't know why you're getting accommodations. I think that, from your point of view, the most favorable, from your point of view, is that instead of saying, we'll continue the accommodations, but give us medical update, they stopped her accommodations. But that's a woman's clothing store, right? Express? Express Unlimited, yeah, it's a chain. It's a woman's clothing store. She then says, without those accommodations, I got sick. And then she took her first FMLA leave from the 8th of December to the 22nd of December, thereby probably infuriating every other salesman or salesperson in the office, because that's the busiest season of the year at Unlimited. She picked the 10 days, or whatever, that are the busiest days of the year, and she was out. Back when people were still shopping. Yeah, that's right, people were still shopping. With all due respect. No, no, I'm saying from your point of view, though. Yeah, he's helping you. I'm trying to help you. I think the strongest, looking from your point of view, is that when they discover they lost her file, they didn't say, okay, we'll continue your accommodation, but you've got two weeks to give us real medical backup for that, and then we'll evaluate it again at that time. Rather, they stop the accommodations, and then say, okay, now before we'll restore them, we want medical evidence. Exactly, and I think the record proves that. I don't think there's a disputed issue there. I think that's a fact. Now, what's puzzling to me is that the defendants have argued, and the judge below seems to have accepted, the defendants' argument that although they needed documentation in order to give her the accommodation, they claimed that they continued to accommodate her. They explicitly state this in their brief, and there was no evidence of that. When I questioned their 30B6 representative at her deposition, I said, what evidence do you have? She said, well, my conversations with the store manager and the district manager. Well, the district manager, and I have nothing in writing, the district manager testified that I withdrew her accommodations because they told me to. Can I ask you a question? Yes. On the date that Judge McKee mentioned, which was the 23rd of December, she submitted a letter from a doctor that said she needs these accommodations, but the letter itself had no medical information in it of any kind. It didn't say, you know, she has neuralgia, or she has this condition, or that condition, and therefore, she needs. It just said, we need these accommodations. Why didn't she give a regular, I mean, that wasn't like a real medical report. Well, they were clearly on notice of what her conditions were. The district manager testified in her deposition that she knew generally what disabilities my client suffered from. So, you're saying they needed medical documentation of those. No, of the need for the restrictions for the accommodations. I'm sorry, say that again. They said they needed medical documentation of a need for accommodations. My client submitted that. Whether her doctor provided... Oh, I see. You're saying, because I had the same concern with that letter, but you're saying that all they asked for was corroboration of the need for accommodations. Then a doctor gives a letter saying, my patient needs these. You're saying that's... Not only that, but should you need more information, please feel free to contact me. And certainly, Express has no obligation to call the doctor and say, why does she need these accommodations? What's her problem? But they accepted what they gave her. They said that's sufficient. And then they allege, or state, that the record supports that they continue to provide those accommodations. And the accommodations they say they continue to provide are not requiring her to work a 40-hour work week, and allowing her to have this unreliable schedule. But the facts show that when she got back from her leave, she did work a 40-hour work week. She did work when scheduled. There's no evidence in the record that demonstrates that she didn't. And the record also establishes that... But does that help you, though? Because then they're going to say, well, wait a minute. Then she doesn't need the accommodations. That was my next point. They have argued, and I think the judge assumed, that, well, the reason that Ms. Paganakis went out on the second leave was that she, in fact, physically couldn't work a 40-hour work week. She physically couldn't come to work when scheduled. But those weren't the only accommodations that had been withdrawn. She was also required to climb. She was also required to work not just an eight-hour work day, but her testimony and the testimony of Daria Carpenter... So they agreed not to have her climb? No. They withdrew that accommodation. Okay. And when? After she came back from the 23rd of December leave? They never reinstated that accommodation. And that may not sound like a big deal, climbing up to hang an advertisement or climbing up to put jeans somewhere. Well, we can't do it. But that's her problem. Let me go back a little bit. I'm embarrassed to have to start digging at this level. But would you make this argument to the district court? Yes, Your Honor. I had some difficulty ascertaining what adverse employment action you were talking about. The district court thought you were arguing termination of employment. And they said, no, the reason wasn't pretext. She resigned. Right. And we specifically addressed that argument because Express's counsel made that argument. And no, we have two ADA claims, discrimination and retaliation. Now, I understand the judge found that they didn't retaliate, and we didn't appeal that. But we did appeal that there was no adverse employment action, the adverse employment action being they withdrew her workplace accommodations and failed to reinstate them. And what do you under... Wait a minute. And constructive discharge. But those are two separate and independent acts that we believe are in violation of the ADA. You're not saying it was retaliation, not constructive discharge or retaliation. No. I think if you separate the constructive discharge and pretend that she had never stopped working and focus only on the fact that they withdrew her workplace accommodations, and then when she requested that they be reinstated, we argue the evidence demonstrated that they failed to engage in an interactive process. They never offered her the opportunity to go back to her old job. They never told her, let's find other suitable accommodations. They simply said, well, they withdrew them. They alleged they put them back. But the evidence and the record establishes that they didn't. So independent... And the other side has articulated. You've now said the adverse employment action was the withdrawal of the accommodations. Now, what is it that you understand they have articulated as the nondiscriminatory reason they withdrew the accommodations? They have... The district court said it was because they made a decision to cease scheduling, cease special scheduling. In effect, I believe it was also a cost issue. They said she was costing them more than other stores. Additional hours had to be allocated so people could make up for the time that she allegedly wasn't there. But I think the fact showed that she... Well, wait a minute, wait a minute, wait a minute. You haven't... What do you understand at this moment? If we were trying to analyze the case, as I'm, believe me, I'm trying to do... Yes, sir. What is it that you understand that they have articulated as the nondiscriminatory reason for having withdrawn the accommodations? It's twofold. First was the cost. The cost of the purported accommodations was too burdensome. And second, I believe they've articulated that they didn't actually stop the accommodations. So... Well, that's not a reason. That's an alternative. That's why the judge's decision was so puzzling to me. But as to the specific legitimate nondiscriminatory reason, I believe they've articulated that she couldn't meet the essential elements of the job because she couldn't work the hours that were required or be there on a regular schedule. Hence, it was costing them too much money. The opening and closing, particularly for the closing of the store, that was part of But didn't they withdraw the accommodations? Now Joe Staples has got me confused. Not an easy thing to analyze myself. But I thought they withdrew her accommodations because they didn't have adequate medical proof in their files that she was entitled to it. I mean, when the story unfolds, she's doing great. She's getting promoted. She got promoted twice, I think. She's promoted by her immediate supervisor. In fact, into a supervisory role. Then at some point, HR out there at the limited headquarters says, just a minute, we can't find in our... Well, we can't find the file, and we can't find in our records any proof, medical proof that she's entitled. So they say, again, looked at from your point of view. All right, we're going to stop the medical proof. We will consider at least reinstating her. Okay. She submits the letter, and now it gets a little murky, but it's a question of the adequacy of that letter. Well, they don't contend. You say it's adequate because of what they knew otherwise. They say, well, it's just a question of accommodation. There's no medical information in there. But they don't contend that that wasn't sufficient. They accepted that. The emails in the record and the testimony... In your view, did they reinstate the email? They told her that that was acceptable. The information they gave her was acceptable. And the emails that are attached in the joint appendix demonstrate that HR then communicated with the store management and the district manager saying, she gave us the stuff we have, that, okay, we're accepting that. It's now up to you, the store management, to decide whether you can make the accommodations. Now, the store management testified, yeah, we could continue to make the accommodations. She was an asset to the team. So I, Anna Klancik, the one who promoted her into the position of co-manager, I made the determination that, yes, we could continue to work with her with the prior accommodations in place. When was that? That was in December, sometime between December 23 and January. And I can point you specifically to that in the record if you'd like. No, that's fine. Go ahead. Were the accommodations reinstated? No, they were not. That's what I was going to say. She went out on leave again. They were not. She went out on leave because of the effect of the climbing and the effect of, quite frankly, part of her problem was exacerbated. She became depressed. So I'm not trying to make excuses saying that. Is it your position that they ever reinstated her accommodations after they took them away in November or whenever they took them away the first time? They did not. And when she came back from leave and before she came back from leave. No, to the day she left. To the day she left, they did not. They took them away to the day she resigned. Did they ever allow her any accommodations, ADA-type accommodations? They did not reinstate the prior accommodations, no. That wasn't the question. Did they ever allow her any ADA-type accommodations? Not after they first took them away. So that's fundamentally your claim. And then your claim is that it amounts to constructive discharge. Fundamentally, yes. And with regard to the FINLA claim, which I believe opposing counsel labeled as frivolous, that claim was a retaliation claim that she went out on leave and when she came back, they refused to reinstate. But you say you dropped that. No. We do not have an ADA retaliation claim, but the FINLA, because there's a FINLA interference interfering with the right to take a claim, to take the leave, which they did not do. But we are saying that after taking the leave and coming back and not having those accommodations put in place, that that was discriminatory. So by not complying with the ADA, they were retaliating for taking the FMLA leave. It may sound silly, but each element of our claim is supported. At heart, this is an ADA case. I believe the FINLA claim is also supported. But generally what this is, is a woman that worked there for many years, they decide we lost her personnel file. They take away the accommodations. She gives them the information they asked for. There's clear evidence that they don't want to put those accommodations back in place. If you look at those emails, the district manager says, do I actually have to accommodate her? And the HR rep says, well, yes and no. Given that we've previously accommodated her for this many years, we'd have a hard time arguing that we couldn't. But if we have a justification such as it's an unreasonable cost, blah, blah, blah, then no, we don't have to accommodate her. But the reason they gave at the time was we lost her personnel file. The reason they gave to the judge on summary judgment in the form of a declaration from their 30B6 witness was it was too expensive. That's the kind of shifting rationale that, in my view, district courts do not appreciate, but this court seems to have accepted. And I think, quite frankly, the reason the court accepted it was the court bought on to express his argument that my client just resigned and she was in Virginia house hunting. She didn't plan on coming back. You know, I can address those facts in my rebuttal if you'd like, but I contend that they have nothing to do with taking away the accommodations in the first place. My guess is we'll hear about them. I was going to ask about them. Chairman, you've been very helpful. Thank you. Thank you. Good morning. Good morning. May it please the Court, my name is Andrew Smith. Along with David Campbell, I represent Express in this matter. I think this is a case that the district court looked at every pleading. They looked at the deposition testimony. They looked at the documentary evidence. They looked at the arguments of counsel, and they got it exactly right. The district court got this case exactly right. Under the ADA, you first have to establish a couple things. The prima facie case. You have to establish that you're qualified to perform the essential functions. You have to establish that there's an adverse employment action. A lot of questions directed at my opposing counsel were questions related to this question of accommodations. And I'm going to see if I can clarify what exactly happened. In June, the plaintiff, Paula Paganakis, was promoted. She was promoted to a co-manager position. A co-manager position requires you to do several things. One of which is to actually be at work as scheduled. Another thing it requires you to do is to work 40 hours a week because the store is allotted that budgetary time. And because the co-manager is paid for that 40 hours. The co-manager is a salaried position. That means that that co-manager gets paid whether or not she's physically present in the store. So the budget and the time and the schedule is very important for that co-manager to maintain. In November of 2003, after she had been promoted to the co-manager position, it is true that Ms. Paganakis sat down with HR, with her store manager, and said, you know what, we've been accommodating you. But there is no medical evidence that we have in our files to support your need for an accommodation. Please provide us with this medical documentation. That's a very reasonable request. And then she gave you the letter, which... She gave us the letter sometime in December, which just said, here are the accommodations that she needs. There's no evidence in the record, Your Honor, that there was a cessation... that she needs an accommodation. Getting a letter from a doctor saying, my patient needs these accommodations would meet that need, though, wouldn't it? Well, it could say, we need the underlying medical reason that would require the employer to give those accommodations. Yeah, but it doesn't sound like you asked for that. Yes, we asked for that. We got the list of the accommodations, but the fundamentally... Please give us more, and if so, where in the record is that? No, I'm not saying, please give us more. What I'm saying, Judge, is in November, when we sat down with her, please provide us medical information that would allow us to continue the accommodations. But here's the crux of this. Either we didn't stop the accommodations, in which case there's no adverse employment action, or we have to look at whether or not the accommodations that were granted were reasonable. And it's submitted here that if they didn't stop, there's no adverse action of a cessation of an accommodation. If they did stop, then the analysis has to be, did the employer act reasonably in stopping these accommodations? And if the employer acted reasonably, then there can be no discrimination under the ADA. It's as simple as that. So did the employer act reasonably when it stopped the accommodations? If a co-manager is required to be at work, that's a reasonable accommodation. Well, if one of the things that you're arguing is, and it makes sense, that one of the essential functions is to open and close the store, she's arguing, they're saying it's an essential function now, but they never trained me on how to open or close the store, and they never gave me keys. With all due respect, the opening and closing the store training argument is a bit of a red herring. She was never trained to do so because she never made herself available to be able to accomplish that task. Why wouldn't that be an issue of fact right there? Because it doesn't matter in the final analysis, Judge. Whether she was trained or not doesn't matter because she was never capable of coming to the store with any sense of regularity to open the store. She testified in her deposition, if it was raining, if it was snowing, if it was foggy, she would call in and say, I can't be there. So the store could not rely upon her to be at work as scheduled. So the store had to make shifts in the schedule to allow others to come to work and open the store because they had to have somebody at the store to open the store to do business. As you pointed out, Judge, this was in the day when people actually shopped. So they needed someone at the store to conduct business. Similarly, they needed someone at the store at the close of business to count the day's receipts and to do all the finishing work that's required of a closing manager. It's also interesting to note, in her deposition, which is at Joint Appendix 137, when you went on your second FMLA leave, you said they made you at times climb too high, climb ladders. Her answer was, they didn't make me climb because I refused to do it. I was given an assignment to completely take down all of the men's denim and she simply refused to do it. She didn't do that task. It's also interesting to note, in the chronology here, there's an extreme... How does that help you if she's arguing that one of the things that she was asking for was an accommodation that would have precluded that kind of a request? Where's the adverse action? If climbing is an essential function of the job, and she says to us, I can't do it, and we say, okay, where's the adverse action? Where's the discriminatory treatment on the basis of a disability? The employee pushes back to their boss and says, you know what? I'm disabled. I can't perform this task. And the boss says, okay. There's no discrimination. There can't be. The other question that came up, if you look at the Joint Appendix, page 88, there's an exchange of email between HR and the district manager, one of which the district manager asks, do we really have to accommodate Ms. Paganakis? And HR says, I'll just read exactly what her email said. Yes and no, we do make every attempt to make an accommodation for an associate. We do, however, always have the ability to say the restrictions are too severe. In these situations, we would work with the lawyers to ensure we were okay. In Paula's situation, we may not have a choice because she's been working only day hours for years and years. It would be hard for us now to say that we couldn't accommodate her in this area. So that's the evidence. The evidence is not that the accommodation stopped, but that they continued. And then she went on two FMLA leaves. That is evidence. Why is that not – why does that not demonstrate that there's a material dispute of fact as to whether the 40-hour week and the opening and closing were essential functions of this job? I mean, she says, look, the jury, we've got – you say these are essential functions, but the fact of the matter is I've been working satisfactorily here for months and months and months, and that in itself gives a factual basis for concluding that it was not an essential. More than satisfactory. She got from the store manager, she got two promotions. So it wasn't even that she was kind of limping along, barely hacking it. But the promotion in June – I'll address Judge Stapleton's question in a minute, but I want to address your point, Judge. And that point is this. She was promoted in June to the co-manager's position. At that time, her duties and responsibilities expand. The co-manager is, in essence, the boss of the store, is responsible for all operations within that store. Now, there is a store manager as well, though. Excuse me? There is a store manager. Obviously, Judge, but the store manager cannot be physically present at the store at all working times. That's why a co-manager has to know all the duties and responsibilities of the store manager. With respect to your question, Judge, I think the honest answer is this woman was accommodated. This woman was accommodated throughout her employment because Express had been doing, as Judge McKee pointed out in his first question to my opposing counsel, this is a case where the employer actually bent over backwards to try to accommodate this individual. So in bending over backwards, this employer gets slapped with two EEOC charges and a lawsuit. So now we have to look in the light of litigation exactly what happened here. In the throes of what happened at the time, was there discriminatory treatment? Is continuing to accommodate someone discriminatory treatment? No, it's not. When someone alleges that they weren't accommodated, then you obviously have to go through the analytical framework of the prima facie case and examine whether or not those accommodations are reasonable or not. So it's a two-prong analysis. Did the accommodations stop? No, they didn't. But when you're being sued for disability-based discrimination and the claim is those accommodations did, in fact, stop, then you have to analyze what the essential functions of that job require you to do and determine whether the requested accommodations are, in fact, reasonable. Are you saying there's a dispute of fact as to whether the accommodations, in fact, stopped? No, sir, Your Honor. What I'm saying is, according to the evidence in the record in the joint appendix, there's no dispute of fact. The accommodations did not stop. But I'm saying that when examining the accommodations... You're saying there's no dispute in the record, Your Honor? There's no dispute in the record, Your Honor. She has said they stopped. She also testified that when she pushed back, as I just read from her deposition transcript, which is at page 137 of the joint... You're talking about a specific order to climb a ladder. I'm talking about back when they said, We lost your file. We don't have medical information. We're stopping the accommodations until you can prove them. That's his position. I think December of 2004. No, I think before December. Late November. November of 2003. The meeting is in November. Unless my co-counsel can find it as I'm sitting here talking, I didn't see it in the record of any allegation or evidence that in November when they met, they said, You know what? Stop working the way you've been working, which is pretty much at your pleasure, and doing the things that you're telling us you can do. There's no evidence of that. What they simply said to her was, We need medical backup in order to continue to accommodate you. You'll notice in the district court's opinion, footnote 12, I believe, of the district court's opinion noted that the first FMLA leave occurred because she started to work without restrictions sometime after that meeting and she got fatigued. So she requested the FMLA leave. Why did she work without restrictions? Because she probably attempted to meet all the essential functions of the job at that point in time. As far as I know, I understand it's circular, and it's mind-numbing when you think about exactly what happened in this case. But in point of fact, we have to focus on this issue. Was this woman the victim of intentional employment discrimination under the ADA? Did this employer intentionally discriminate against her? No, it did not. And I would submit that the fact that this woman was given two FMLA leaves after this November meeting would show evidence of no discriminatory animus whatsoever. The FMLA leaves were given without restriction. They were given without qualification. They were given when requested, and she was asked to return to work. I would also point out that after the FMLA leaves were given, after the November meeting, there was never a scintilla of evidence that this woman complained to anybody that she was being discriminated against. There was never a scintilla of evidence that she was being treated differently because of what happened or didn't happen at that November meeting. Simply stated, there's no evidence that this woman was intentionally treated differently because of what happened or did not happen at that November meeting. So there's two prongs to this analysis. There's no adverse employment action, and she could not perform the essential functions of her job without these accommodations. Let me go back. I'm looking at her affidavit. It's appendix 298. The defendant withdrew my workplace accommodations in early November. For example, as of November 2003, I was required, among other things, to change my schedule and work several evening shifts. The defendant also changed his managerial meetings from mornings to evenings in an effort to prevent me from being able to participate in the meeting due to my inability to drive at night. The defendant also began to assign me to tasks that involved climbing. The defendant also frequently required me to work from 8 a.m. until 4 p.m. with no breaks and assigned me to work five or six days in a row. She is saying that they did take away the accommodations. I mean, there's a dispute of fact, it seems to me. Unless, as pointed out, with respect to at least the climbing allegation, there's a direct contradiction between what she's claiming in her affidavit and what she testified to under oath. But if they assign her to do a job to say, go climb, they're not giving her the accommodations. She may willfully say, I'm not going to do it, and they may back off. That's not the same as giving an accommodation. But if you look again, Your Honor, at what the accommodations were requested, then you have to get into the question, were they reasonable? Obviously, showing up to work and working a 40-hour budgeted timeframe is reasonable for the employer to request, and it's unreasonable for an employee claiming to be the victim of discrimination to say, you know what, I shouldn't have to do this. Did she ever say she didn't have to work 40 hours a week? The issue, I thought, was she could work part of it at home, doing accounts receivable and that kind of thing. Your Honor, there's no part of a co-manager's job that you can simply mail in. You cannot mail it in. That's deflection of the question. She never said, I only want to work 30 hours a week or 20 hours a week. She wanted accommodation to do some of the work at home, and she, in fact, did do some of the work at home, paper-type work. In so doing, she burdened the store by requiring other employees to work opening and closing. It would be great if she was willing to work 40 hours a week, and the issue was not if she wanted to work less than 40. The issue was where she was going to do the work. The issue is when presented with a schedule. When presented with a schedule, she couldn't meet the schedule. We've all talked about the letter, which is a joint appendix. My co-counsel just pointed out 368, and it lists the accommodations. All it says is daylight work hours, well-lit area, no climbing, no wet workplace, periodic breaks, intermittent days off. That's what it says. But she didn't say, I only want to work 30 hours a week or I only want to work 20 hours. She was willing to work 40 hours a week, but not necessarily on the schedule that you thought was the right schedule. Isn't the employer entitled to create a schedule that it's entitled to have its employees do? Yeah, I'm not saying otherwise. And isn't it reasonable for a store manager to assume the duties of a store manager that don't place a burden on the remaining individuals who have to perform the functions of this person when she's not present? In short, there's simply no evidence of discriminatory treatment here. The accommodations we would submit never stopped, and the adverse employment action of termination never occurred. She resigned. Wait a minute. I think I'm beginning to see now why I had trouble deciphering what the employer's articulated reason for withdrawing the accommodations was. You haven't articulated a reason because you say the undisputed evidence is that the accommodations were never withdrawn. Yes, Your Honor. Okay. Thank you. And then we examined what the accommodations were in light of the allocation that they weren't given. And you say the accommodations she requested are in excess of what the law would require because it would prevent her from doing the essential functions of her job. That's your position. A, you never stopped them, but B, even if you did, what she requested was unreasonable for the reason I just said. I would simply add a semicolon after we never stopped them. I would say, therefore, there's no adverse employment action. Otherwise, Your Honor, I agree with everything you just said. Okay. Thank you. I'll have to improve my punctuation. He improves ours. Well, you get to grade my papers, too. Is this past fail mode? I hope so. I think things speak for themselves. This is what we tried to raise. What are they saying? They didn't withdraw the accommodations. There's no evidence in the record that they withdrew the accommodations. Well, first, my client testified that they did. I understand that they might have asked her some leading questions that caused her to say that they didn't in her deposition, but what about Daria Carpenter's declaration, a former coworker of my client, found at page 341 and 342 and 343 of the joint appendix, which says starting in the fall of 2003 and continuing through the winter of 2003 into early 2004, Paula's supervisor stopped accommodating her known disabilities and conditions. For example, among other things, they required her to work evening shifts, and she testified in the record show that she did work the evening shifts. Now, they say, well, the training is a red herring. Well, what about not giving the person the keys to close the store that you're requiring her to close and that you've scheduled her to close? The evidence shows that she did close the store, provided they had someone else there with the keys, so she could close the store. Ms. Carpenter also said that they moved the meetings from the morning to the evening. Ms. Carpenter also said that they didn't allow her to take breaks during the day at work. Well, it's one thing to work a 40-hour work week and eight hours a day, but shouldn't you be allowed to have a break to go to the bathroom or to go to lunch? My client testified, and Ms. Carpenter... I used to take a break. See, I don't consider that a break. You go to the bathroom. You don't punch out. Man, I just wouldn't imagine punching a clock anyhow. There's nothing in the record that suggests she was chastised for going to the bathroom. There is. She testified that her requests to go to the bathroom were denied. Her requests to take a lunch break were denied. This is not the third grade where she raised her hand and said, I want to go to the bathroom. In essence, it is the third grade. She's the manager. She's not the manager. I look in the bathroom. Okay, you may go to the bathroom. She's not the manager. She is a co-manager. There are about seven co-managers at the store, and the whole time she's been working underneath Kristen Bosley, the manager of the store. Now, we also say, oh, you know, they're not teenagers, but she testified and Ms. Carpenter testified and Otis Nelson, in his declaration, he's another former employee, testified that when she came back from her first FINLA leave, they chastised her and said she's not management material because she can't do the job or because she needs to take breaks. I mean, the red herring, there's no red herring here. They focused on the fact that there's no adverse employment action because they didn't withdraw the accommodations. There's clear evidence in the record that they did. At the very least, there's a disputed fact. Unfortunately, the judge below simply ignored the evidence and accepted their brief and ignored mine, and maybe that means that my brief was too long or I attached too much evidence or maybe I made too many arguments, but the judge just ignored all of that. Anna Klancik, who was the person who had previously allowed the accommodations, testified in her deposition as well as in her declaration at page 306 of the Joint Appendix. Specifically, first she said, I was aware that Paula suffered from medical conditions that necessitated workplace accommodations. So even if they didn't know what the precise medical problem was, they clearly regarded her as disabled, and that's something that we argued that the judge also ignored. But Ms. Klancik said at paragraph 6 of her declaration, based upon the directives of my superiors and Defendant's Human Resources Department, Paula's workplace accommodations were withdrawn in November or early December 2003. These workplace accommodations were not reinstated prior to her termination of employment in March. And what's the site for that again, the record site? It's page 30306 of the Joint Appendix. It starts on 305 and goes to 305. 305, and it's paragraph 6. And again, I'd also point you to 0342, Daria Carpenter's declaration. Notably, the defendants never called Ms. Carpenter for a deposition. They never called Otis Nelson for a deposition. These are two former employees who voluntarily gave us sworn statements under oath, under penalty of perjury, that they did withdraw the accommodations, and that not only did they do that, but they also treated her in an unwelcome manner. Maybe it was not a hostile work environment, but to this person with disabilities who had just taken family medical leave because her accommodations had been pulled out from under her and had not been reinstated, when she came back, they chastised her. And I apologize if I'm naive, but I don't think this is funny. I don't think that accusing my client of being dishonest, which is essentially what they've done in their briefs, is funny. I mean, maybe it's my spidey senses. You referred to a comic book strip in your first argument this morning. But maybe it's my spidey senses, but something is not right here. And I respectfully submit that the district court ignored pretty much most of the evidence that we put into our brief, and a close examination of it will prove our points. Thank you very much. Spidey? Is that a comic strip, spidey? Spider-Man, spidey senses. Spidey is Spider-Man, okay. I am familiar with Spider-Man. My son's five, and I apologize. My youngest daughter is much older than that, but I've seen Spider-Man. Thank you both, really exceptionally well argued. You're both very well prepared, and thank you very much. Mr. Smith, I know that you're from Cleveland. Should I infer from that that you are a fan of the brown and the orange? Actually, Your Honor, I was born and raised in Uniontown, Pennsylvania. You can leave, Mr. Smith. I'm a fan of the black and gold. Yeah, you can leave now. I thought I finally found another brown. Oh, thank you. Which is heartening, because usually the person who doesn't speak is the one who did all the work. Thank you. Why don't you just take a brief break, and then take the Womack v. Smith case. Thank you. Thank you. Thank you, Mr. Smith. Thank you very much. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.